UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

REPORT AND RECOMMENDATION

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Gregory T. Hunter

                Plaintiff,

vs.

Michael J. Astrue, Commissioner
of Social Security,

                Defendant.        Civ. No. 08-5245 (MJD/RLE)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## I.  Introduction

The Plaintiff commenced this action, pursuant to Section 205(g) of the Social

Security Act, Title 42 U.S.C. §405(g), seeking a judicial review of the

Commissioner's final decision which denied his application for Disability Insurance

Benefits ("DIB"), and for Supplemental Security Income ("SSI"). The matter is now

before the Court upon the parties' cross-Motions for Summary Judgment. The

Plaintiff has appeared by Edward C. Olson, Esq., and the Defendant has appeared by

Lonnie F. Bryan, Assistant United States Attorney. For reasons which follow, we

recommend that the Plaintiff's Motion for Summary Judgment be denied, and that the Defendant's Motion for Summary Judgment be granted.

## II. Factual and Procedural Background.

The Plaintiff first applied for DIB on March 30, 2005, alleging that he had been disabled since May 1, 2002. [T. 16, 73, 75, 79]. The Plaintiff met the insured status requirements at the alleged onset date of disability, and he remained insured for DIB through September 30, 2007. [T. 20].

On August 17, 2005, the State Agency denied the claim upon initial review, and upon reconsideration.[1] [T. 33, 76-77]. On April 8, 2006, the Plaintiff untimely requested a Hearing before an Administrative Law Judge ("ALJ") but good cause was established for the late filing. [T. 16, 57-58]. On August 1, 2007, the ALJ sent a Notice of Hearing to the Plaintiff, which he signed and returned on August 13, 2007, indicating that he would be present at the Hearing. [T. 16, 43]. On August 30, 2007, a Hearing was conducted, at which time, the Plaintiff did not appear personally, but appeared by counsel. [T. 16, 449].

---

[1]The Defendant notes that he has been unable to locate the initial denial of DIB in the administrative transcript. See, Defendant's Memorandum in Support, Docket No. 16, at 2 n. 1. However, the transcript reveals that the Plaintiff was likely denied DIB on August 17, 2005. [T. 83].

Thereafter, on November 17, 2007, the ALJ issued a decision denying the Plaintiff's claim for benefits. [T. 16-32]. On January 12, 2008, the Plaintiff filed a request for review. [T. 12]. However, on April 25, 2008, the Appeals Council denied the request for further review. [T. 6-8]. Thus, the ALJ's determination became the final decision of the Commissioner. See, Grissom v. Barnhart, 416 F.3d 834, 836 (8th Cir. 2005); Steahr v. Apfel, 151 F.3d 1124, 1125 (8th Cir. 1998); Johnson v. Chater, 108 F.3d 942, 943-44 (8th Cir. 1997); Title 20 C.F.R. §404.981.

### III. Administrative Record

A. Factual Background. The Plaintiff was forty-six (46) years old on the date of the Hearing. [T. 30]. The Plaintiff did not graduate from high school, but had received his general equivalency degree ("GED") in 2003, and he has relevant work experience in tool sales, roofing, as a cashier, and supply clerk. [T. 99, 116, 151]. The Plaintiff alleges that he has been unable to work since 2002, due to multiple fractures, surgeries, pancreatitis, and attention-deficit hyperactivity disorder ("ADHD").[2] [T. 86, 124].

---

[2]Pancreatitis is an "inflammation of the pancreas, which * * * is complicated by autodigestion of pancreatic tissue by its own enzymes." Dorland's Illustrated Medical Dictionary, at 1388 (31st Ed. 2007).

1. <u>Medical Records</u>. On July 6, 1982, the Plaintiff had a computerized tomography scan ("CT scan") taken of his head, at Midway Hospital in St. Paul, Minnesota. [T. 155]. The CT scan found no evidence of a subdural hematoma, or other pathological changes.[3] [T. 155]. On May 22, 2002, the Plaintiff was admitted to the hospital at the Hennepin County Medical Center ("HCMC"), in Minneapolis, Minnesota, and was examined by Jonathan D. Kirsch, M.D. ("Dr. Kirsch"). [T. 156-58]. At the time of his admission, the Plaintiff's primary complaint was abdominal pain. <u>Id.</u> The Plaintiff also told Dr. Kirsch that he had recently been on a two (2) to five (5) day drinking binge, and had been prescribed a Duragesic patch for pain.[4] [T. 156, 158]. Dr. Kirsch diagnosed the Plaintiff with chronic pancreatitis secondary to alcohol abuse, Hepatitis C, and severe alcohol abuse. [T. 158-59]. On May 25, 2002, the Plaintiff was discharged from HCMC with specific instructions to abstain from alcohol. [T. 157].

---

[3]A subdural hematoma is the "accumulation of blood between the dura mater and the arachnoid, resulting in the creation of an abnormal space[.]" <u>Dorland's Illustrated Medical Dictionary</u>, at 843 (31st Ed. 2007).

[4]A Duragesic patch "is indicated for management of persistent, moderate to severe chronic pain[.]" <u>Physician's Desk Reference</u>, at 2353 (62nd ed. 2008).

On June 10, 2002, the Plaintiff was seen at HCMC by Martin J. Stillman, M.D. ("Dr. Stillman"). [T. 196]. Dr. Stillman noted the Plaintiff's past medical history including pancreatitis, chronic pain disorder, hepatitis C, and alcohol abuse. Id. The Plaintiff told Dr. Stillman that he felt okay, but was still experiencing pain even though he was using fentanyl patches, Percocet, and oxycodone for his pain.[5] Id. Dr. Stillman observed that the Plaintiff was tearful, but denied any feelings of hopelessness or suicidal thoughts. Id. Dr. Stillman also refilled the Plaintiff's prescriptions for Oxycodone and fentanyl patches. Id.

On July 2, 2002, the Plaintiff was admitted to the hospital at HCMC, and was examined by Dr. Kirsch. [T. 165]. Dr. Kirsch noted that the Plaintiff complained of extreme abdominal pain, had difficulty eating or drinking without vomiting, and appeared lethargic. Id. Dr. Kirsch concluded that the Plaintiff's abdominal pain was a result of his chronic pancreatitis, which was likely exacerbated by his recent drinking binge of approximately two (2) gallons of vodka. [T. 162-66]. In addition, the Plaintiff smelled like alcohol, spoke with his eyes closed, and was irritable and

_____

[5]Percocet is "indicated for the relief of moderate to moderately severe pain." Physician's Desk Reference, at 1126 (62nd ed. 2008). Oxycodone hydrochloride is used as a pain killer. See, Dorland's Illustrated Medical Dictionary, at 1377 (31st Ed. 2007).

agitated when asked questions. [T. 163]. On July 4, 2002, the Plaintiff was discharged with specific instructions to not drink alcohol. [T. 160].

On July 23, 2002, the Plaintiff was examined by Alfred L. Clavel, M.D. ("Dr. Calvel"), who was the Director of the Hennepin Pain Clinic, at HCMC. [T. 195]. During the examination, the Plaintiff stated that his pain had worsened but that his current pain medication made it manageable. Id. Dr. Clavel took the Plaintiff off the fentanyl patches, and prescribed him MS Contin.[6] Id.

On July 27, 2002, the Plaintiff was admitted to the hospital at HCMC, and was examined by Scott C. Crowe, M.D. ("Dr. Crowe"). [T. 170-71]. The Plaintiff had been on a four (4) day drinking binge and, as a result, was experiencing severe abdominal pain, nausea, and vomiting. [T. 170]. Dr. Crowe observed that the Plaintiff was writhing in pain and clutching his abdomen. Id. The Plaintiff also admitted that he had experienced similar abdominal pain in the past, after drinking alcohol. Id. Dr. Crowe placed the Plaintiff on diazepam, so as to ease his acute

---

[6]Oxycontin tablets are "indicated for the management of moderate to severe pain[.]" Physician's Desk Reference, at 2682 (62nd ed. 2008).

alcohol withdrawal symptoms, and Dilaudid to control his pain.[7]  [T. 171].  On July

31, 2002, the Plaintiff was discharged from HCMC.  [T. 168].

On August 13, 2002, the Plaintiff was seen by Dr. Clavel.  [T. 194].  The

Plaintiff's pain had improved but he had recently ran out of his prescribed pain

medication.  Id.  In order to control his pain, the Plaintiff had taken twelve (12)

Tylenol Threes the previous day.  Id.  Dr. Clavel instructed the Plaintiff that, if he

abused his medication, Dr. Clavel would no longer prescribe him pain medications.

Id. Dr. Clavel also observed that the Plaintiff's pain management was complicated by

his history of substance abuse, and his antisocial personality disorder.  Id.

On September 17, 2002, the Plaintiff had a followup visit with Dr. Clavel.  [T.

193].  The Plaintiff reported that his pain had improved but that he was having

difficulty sleeping.  Id.  The Plaintiff also reported that he believed he would be able

to get a full-time job, if he had better control over his pain.  Id.

---

[7]Diazepam is used "for the management of anxiety disorders or for the short-term relief of the symptoms of anxiety."  Physician's Desk Reference, at 2765 (62nd ed. 2008).  Dilaudid is the "trademark for preparations of hydromorphone hydrochloride."  Dorland's Illustrated Medical Dictionary, at 527 (31st Ed. 2007).  Hydromorphone hydrochloride is used "for the relief of moderate to severe pain[.]"  Id. at 891.

On October 8, 2002, the Plaintiff went to the Emergency Room at Unity Hospital, in Fridley, Minnesota, and was examined by James Penland, M.D. ("Dr. Penland"). [T. 175-76]. The Plaintiff told Dr. Penland that he been on a five (5) day drinking binge, and had been consuming approximately one (1) to two (2) quarts of alcohol per day. [T. 175]. However, the Plaintiff had only experienced abdominal pain for the last few days. Id. Dr. Penland ordered a CT scan of the Plaintiff's abdomen, and spoke with Jill Schroeppel, M.D. ("Dr. Schroeppel"), who agreed to admit the Plaintiff to the hospital. [T. 172-76].

On that same day, Dr. Schroeppel conducted her own examination of the Plaintiff. [T. 172-74]. She described the Plaintiff as alert, and oriented times three, with no immediate signs of distress. [T 173]. Dr. Schroeppel diagnosed the Plaintiff's abdominal pain as gastritis, but also recognized an acute pancreatic process, or chronic pancreatitis, as other possible causes.[8] Both Dr. Penland and Dr. Schroeppel agreed that the Plaintiff suffered from acute alcoholism. [T. 174-76]. On October 9, 2002, the Plaintiff had a CT scan of his abdomen, which showed that the pancreas was normal but that there was also a "possibility of mild pancreatitis." [T. 184-86].

---

[8]Gastritis is an "inflammation of the stomach." Dorland's Illustrated Medical Dictionary, at 774 (31st Ed. 2007).

On November 19, 2002, Dr. Clavel examined the Plaintiff. [T. 192]. The Plaintiff stated that his pain had increased slightly since his last visit. Id. In addition, the Plaintiff reported that he was experiencing a high level of stress as a result of his recent driving while intoxicated conviction, and probation violations. Id. Dr. Clavel also noted that the Plaintiff was tearful, and had difficulties sleeping. [T. 192].

On October 28, 2003, Dr. Clavel examined the Plaintiff the day after his release from jail. [T. 191]. The Plaintiff reported that, since his release, he had been taking numerous Tylenol Threes, which the jail had provided, in order to ease his pain. Id. During the examination, Dr. Clavel noted that the Plaintiff smelled like alcohol, his eyes were bloodshot, and he appeared to be disheveled. Id. When Dr. Clavel examined the bottle of Tylenol Threes, he noticed that the label stated the bottle contained sixty-three (63) tablets, but the bottle only had forty-three (43) tablets left. Id. Dr. Clavel concluded that the Plaintiff has "clearly [lost] control of his ability to responsibly use medications and also that he is drinking again." Id. In addition, Dr. Clavel determined the Plaintiff would not be a proper candidate for outpatient narcotics. Id.

On June 28, 2004, the Plaintiff was seen by Sushila Mohan, M.D. ("Dr. Mohan"), at the Alllina Medical Clinic, in Woodbury, Minnesota. [T. 205-06].

During the appointment, the Plaintiff reported having anger issues, and difficulty focusing on a single task, since his release from prison in October of 2003. [T. 205]. In addition, the Plaintiff noted that he had difficulty sleeping, daily mood swings, depression, and alcohol abuse. [T. 205-06]. The Plaintiff also mentioned two (2) auto accidents, which had resulted in several bone fractures. [T. 205]. Dr. Mohan diagnosed the Plaintiff with depression and alcohol dependency. [T. 206]. At the end of the visit, Dr. Mohan prescribed the Plaintiff Trazodone and Lexapro.[9] Id.

On September 2, 2004, the Plaintiff was examined by Dr. Mohan. [T. 201]. The Plaintiff reported difficulty managing his ADHD, and stated that the Lexapro had not improved his racing thoughts, depression, or anxiety. Id. Dr. Mohan observed that the Plaintiff's overall sadness was consistent with his thought pattern. Id. However, Dr. Mohan noted that the Plaintiff did not display any psychosis, or suicidal thoughts, and that his insight and judgment were based in reality. Id.

On January 31, 2005, the Plaintiff was examined by David R. Hilden, M.D. ("Dr. Hilden"), at HCMC. [T. 207-08]. The Plaintiff stated that he had been on a

---

[9]Trazodone is "an antidepressant used to treat major depressive episodes with or without prominent anxiety." " Dorland's Illustrated Medical Dictionary, at 1983 (31st Ed. 2007). Lexapro is used for "the treatment of [a] major depressive order[.]" Physician's Desk Reference, at 1176 (62nd ed. 2008).

drinking binge for several days and that, in the last twenty-four (24) hours, he had felt nauseated, was vomiting, and was experiencing severe abdominal pain. [T. 207]. The Plaintiff reported that he had remained sober for three (3) years, but had relapsed shortly after his grandfather's death. Id. Despite the Plaintiff's pain, Dr. Hilden reported that the Plaintiff was pleasant, and conversed in complete sentences. Id. Dr. Hilden believed that the Plaintiff's abdominal pain was a result of his alcoholic pancreatitis. Id. Dr. Hilden started treatment for alcohol withdrawal, and prescribed Dilaudid for pain relief. [T. 208]. On February 1, 2005, the Plaintiff reported pain relief, however, on February 3, 2005, the Plaintiff left before being properly discharged from the hospital. [T. 206].

On April 27, 2005, the Plaintiff was examined by Wendy J. Miller, M.D. ("Dr. Miller"), at HCMC. [T. 215-16.]. The Plaintiff reported that he began to experience severe abdominal pain after drinking a twelve (12) pack of beer. [T. 215]. The Plaintiff stated that the pain was similar to his past instances of alcoholic pancreatitis. Id. He also reported feeling very stressed, and asked to speak to a psychiatrist. Id. Dr. Miller ordered that the Plaintiff be treated for alcohol withdrawal, and prescribed Dilaudid for his pain. [T. 215-16]. She also ordered that the Plaintiff undergo a psychiatric evaluation. [T. 216].

On June 1, 2005, the Plaintiff underwent a psychiatric consultative examination by Alford Karayusuf, M.D. ("Dr. Karayusuf"). [T. 221]. The Plaintiff reported that he had ADHD, and had been depressed since he was sixteen (16) years old. Id. His depression had worsened, after he found his father dead of carbon monoxide poisoning. Id. Although the Plaintiff had been receiving outpatient psychiatric treatment since 1998, he had never been hospitalized for psychiatric treatment. Id. The Plaintiff stated that he had been feeling very sad and unhappy, but denied having suicidal thoughts. [T. 222]. The Plaintiff admitted to having difficulty sleeping, racing thoughts, low self esteem, a diminished memory, and an inability to concentrate. Id.

The Plaintiff stated that he began drinking alcohol when he turned eighteen (18) years old, and usually drank up to a half a gallon of alcohol daily. Id. The Plaintiff had been treated for alcoholism five (5) times, and since 2003, only drank once every six (6) months. Id. He also admitted to being a daily marijuana user in the early 1970s, but quit shortly thereafter. Id. Dr. Karayusuf also noted that the Plaintiff claimed that he had suffered traumatic brain injuries in a pair of motorcycle accidents in the 1980s. Id.

The Plaintiff reported that he was currently living in his mother's basement. Id. He stated that he cooked for himself, went grocery shopping with his girlfriend once a week, saw his girlfriend every day, cleaned his floor, and did his own laundry. Id. The Plaintiff stated that he goes to Alcoholics Anonymous ("AA") meetings once a week, and occasionally spoke at the meetings. Id. The Plaintiff advised that he watched fourteen (14) hours of television a day, and that he has a few other friends. Id.

With respect to the Plaintiff's mental status, Dr. Karayusuf observed that the Plaintiff was oriented to time, place, and person. Id. In addition, the Plaintiff had a fair immediate digit recall, could recall the names of the past five (5) United States Presidents correctly, and was able to remember three (3) unrelated objects after five (5) minutes. [T. 222-23]. Although the Plaintiff was unable to subtract serial sevens, he correctly subtracted six (6) from fifteen (15). [T. 222]. Dr. Karayusuf noted that the Plaintiff's recent and remote memory were in tact, that he had a dull normal intelligence, but had difficulties trusting others. [T. 223].

During his conversation with the Plaintiff, Dr. Karayusuf noted that the Plaintiff's speech was emotional, tense, spontaneous, and rambling. Id. However, Dr. Karayusuf reported that the Plaintiff was not restless and that he had no

psychomotor agitation or retardation. <u>Id.</u> Dr. Karayusuf observed that the Plaintiff appeared to be moderately to severely depressed, but that his affect was appropriate, and the Plaintiff had no loosening of associations. <u>Id.</u> Dr. Karayusuf also believed that the Plaintiff had an organic personality disorder, and possibly an organic mood disorder. <u>Id.</u>

Dr. Karayusuf concluded that the Plaintiff was "able to understand, retain and follow simple instructions." <u>Id.</u> However, the Plaintiff would have difficulty interacting with workers, supervisors, and the public, because of his rambling speech and his severe depression. <u>Id.</u> Dr. Karayusuf also found that the Plaintiff would have difficulty maintaining pace and persistence. <u>Id.</u>

On October 30, 2003, the Plaintiff was examined by L. Michael Espeland, M.D. ("Dr. Espeland"), at the Midway Pain Center, in St. Paul, Minnesota. [T. 266]. Dr. Espeland observed that the Plaintiff was alert and oriented but was suffering from abdominal pain, as a result of his chronic pancreatitis. [T. 266]. Dr. Espeland noted that the Plaintiff could carry a conversation, and answered all questions appropriately. [T. 267]. The Plaintiff's memory was intact, and although his affect was flat, the Plaintiff was pleasant and cooperative. <u>Id.</u> The Plaintiff was also able to walk on his

toes and heels.  Id.  Dr. Espeland directed the Plaintiff to return in one (1) week for the administration of a Duragesic patch.  Id.

On November 5, 2003, the Plaintiff was seen by Dr. Espeland.  [T. 265].  The Plaintiff stated that he had moderate pain, but he was not currently taking any pain medication.  Id.  Dr. Espeland observed that the Plaintiff was alert, oriented, followed the conversation, and answered all questions appropriately.  Id.  Dr. Espeland also described the Plaintiff as pleasant and cooperative.  Id.  At the end of the visit, Dr. Espeland provided the Plaintiff with a Duragesic patch.  Id.

On November 14, 2003, the Plaintiff had a followup with Dr. Espeland.  [T. 264].  The Plaintiff reported that his pain had not improved, and that his Duragesic patch provided little relief.  Id.  The Plaintiff also denied any progressive neurological deficits.  Id.  Dr. Espeland described the Plaintiff as alert, oriented, and that he answered questions appropriately.  Id.  The Plaintiff was also cooperative and pleasant.  Id.  Dr. Espeland decided to increase the dosage of the Plaintiff's Duragesic patches, and he also prescribed Oxycodone.  Id.

On November 24, 2003, the Plaintiff was examined by Dr. Espeland.  [T. 262].  The Plaintiff reported that his pain medication had reduced his pain, and he was able to  work eight (8) hour days as a construction worker.  Id.  Dr. Espeland reported that

the Plaintiff was alert, and could answer and converse normally, and was pleasant and cooperative. Id. The Plaintiff also had a full range of motion in his back and walked normally. Id.

On December 19, 2003, the Plaintiff had a followup with Dr. Espeland. [T. 260]. The Plaintiff was bright and cheerful and reported that his medication improved his pain significantly. Id. Dr. Espeland issued the Plaintiff a prescription for MS Contin.[10] Id.

On January 4, 2004, Dr. Espeland examined the Plaintiff. [T. 258]. The Plaintiff reported an increase in abdominal pain, but he still had a full range of motion in his back. Id. Dr. Espeland increased the Plaintiff's dosage of MS Contin, and Oxycodone, in order to combat the Plaintiff's pain. Id. On February 6, 2004, the Plaintiff was seen by Dr. Espeland. [T. 256]. The increase in his pain medication had reduced the Plaintiff's pain, but he requested to be placed on Oxycontin because he believed that it gave him the greatest pain relief. Id. The Plaintiff also reported being

---

[10]MS Contin is a "controlled-release oral formulation of morphine sulfate indicated for the management of moderate to severe pain[.]" Physician's Desk Reference, at 2678 (62nd ed. 2008).

under a significant amount of stress, because his elderly grandfather was in poor health.  Id.  Dr. Espeland prescribed the Plaintiff Oxycontin and Amitriptyline.[11]  Id.

On March 5, 2004, Dr. Espeland examined the Plaintiff.  [T. 255].  The Plaintiff reported a slight increase in pain, but stated that the Oxycontin managed his pain effectively.  Id.  Dr. Espeland observed that the Plaintiff's mood, speech, and range of motion, were all normal.  Id.  Dr. Espeland prescribed the Plaintiff roxicodone to supplement the effect of the Plaintiff's Oxycontin.[12]  Id.  On October 14, 2004, the Plaintiff had a followup visit with Dr. Espeland.  [T. 253].  The Plaintiff reported moderate abdominal pain even after taking his medication.  Id.  However, the Plaintiff reported having three (3) good days a week, and stated that he had been working light construction for approximately twenty-five (25), to thirty (30) hours a week.  Id.  In addition, the Plaintiff stated that he had a new girlfriend, and attended regular AA meetings.  Id.  Although the Plaintiff was alert, oriented, and able to answer questions appropriately, Dr. Espeland noted that the Plaintiff's speech was slow at times.  Id.

---

[11]Amitriptyline is used for the treatment of moderate to severe depression associated with moderate to severe anxiety.  Physician's Desk Reference, at 3300 (62nd ed. 2008).

[12]Roxicodone is a "trademark for preparation of oxycodone hydrochloride and acetaminophen."  Dorland's Illustrated Medical Dictionary, at 1681 (31st Ed. 2007). Oxycodone hydrochloride is used as a pain killer.  Id. at 1377.

On March 16, 2005, the Plaintiff saw Dr. Espeland for a followup visit. [T. 251]. The Plaintiff reported that his pain had increased recently because of stress at home. Id. The Plaintiff stated that he was not drinking alcohol, and that he was sleeping without difficult. Id. At this visit, Dr. Espeland noted that the Plaintiff's speech was clear and articulate. Id. On May 18, 2005, the Plaintiff was examined by Dr. Espeland. [T. 249]. Since his last visit, the Plaintiff reported that his pain had decreased but that he was not currently working. Id. In addition, the Plaintiff admitted that his mother had given him some of his deceased grandfather's pain medication, and sleeping pills. Id. Dr. Espeland informed the Plaintiff of the dangers of taking medication that was not prescribed to him. Id. He also reported that the Plaintiff's speech, mood, and memory, remained unchanged. Id. At the end of the visit, the Plaintiff was prescribed Lidoderm patches for pain.[13]

On July 26, 2005, the Plaintiff was seen by Dr. Espeland. [T. 247]. The Plaintiff reported that his pain level was stable, but that he continued to have difficulty sleeping. Id. Dr. Espeland noted the smell of alcohol on the Plaintiff's breath, but the Plaintiff denied drinking any alcohol. Id.

---

[13]Lidoderm is used for "relief of pain associated with post-herpetic neuraliga." Physician's Desk Reference, at 1114 (62nd ed. 2008).

On October 22, 2005, the Plaintiff was seen at HCMC by David Stuart, M.D. ("Dr. Stuart"). [T. 303-04]. The Plaintiff was complaining of severe abdominal pain after being struck by a customer's car at a gas station. [T. 303]. Prior to experiencing the abdominal pain, the Plaintiff had started a four (4) day drinking binge in order to ease the pain from the car accident. Id. Dr. Stuart observed that the Plaintiff appeared to be suffering from chronic pancreatitis and alcohol withdrawal. [T. 303-04]. Dr. Stuart prescribed the Plaintiff Dilaudid for pain, and began treating him for alcohol withdrawal. [T. 304].

The Plaintiff was also seen at HCMC by Jeff Boyd, PhD ("Dr. Boyd"), a clinical psychologist.[14] [T. 301-02]. The Plaintiff reported that he had a history of alcoholism, and that shortly after his grandfather passed away, in April of 2005, he had gone on a drinking binge which resulted in his hospitalization for pancreatitis. [T. 301]. The Plaintiff had started therapy but quit after only a few sessions. Id. The Plaintiff stated that he had been diagnosed with situational depression, and was prescribed trazadone and risperidone, but had discontinued their use after a short-

---

[14]Dr. Boyd's notes do not include the date of his examination of the Plaintiff.

time.[15]  Id.  Dr. Boyd observed that the Plaintiff was cooperative, his speech was unremarkable, and his thought processes were logical and coherent.  [T. 302].  The Plaintiff stated that he was slightly depressed and anxious, but he denied any suicidal ideation, or auditory or visual hallucinations.  Id.  Dr. Boyd diagnosed the Plaintiff with anxiety, depression, and alcohol abuse.  Id.  The Plaintiff was given information about therapy resources in the area, but was not prescribed any medication.  Id.  On October 24, 2005, the Plaintiff left HCMC prior to being properly discharged.  [T. 299].

On November 20, 2005, the Plaintiff was examined by Dr. Espeland.  [T. 245]. The Plaintiff reported continuing abdominal pain, but stated that he was able to walk on a regular basis, and was feeling fairly good.  Id.  In addition, he reported feeling less stress at home.  Id.  Dr. Espeland observed that the Plaintiff was alert and oriented times three.  Id.  The Plaintiff's speech was clear and articulate, and he answered all questions appropriately.  Id.  Dr. Espeland also described the Plaintiff as pleasant and cooperative.  Id.

---

[15]Risperidone is used "for the treatment of schizophrenia."  Physician's Desk Reference, at 1716 (62nd ed. 2008).

On December 29, 2005, the Plaintiff had a followup visit with Dr. Espeland. [T. 365]. The Plaintiff stated that he had moderate abdominal pain, but reported that the Liboderm patch provided significant pain relief. Id. Dr. Espeland noted that the Plaintiff was rather pleasant, and that he detected no alcohol on the Plaintiff's breath. Id.

On March 2, 2006, the Plaintiff was examined by Dr. Espeland. [T. 363]. The Plaintiff reported an increase in pain in the last few weeks, and he was quite emotional. Id. The Plaintiff requested that his medications be increased, but he also admitted that he had already increased his medication without Dr. Espeland's approval. Id. In addition, the Plaintiff had stopped seeing his psychiatrist because the psychiatrist would not allow his girlfriend to participate in his sessions. Id. Dr. Espeland observed that the Plaintiff was anxious and that he had some difficulty rising from a sitting to a standing position. [T. 364]. However, Dr. Espeland refused to increase the Plaintiff's medication. Id.

On May 18, 2006, the Plaintiff returned to Dr. Espeland's office for a followup appointment. [T. 361]. The Plaintiff's pain had decreased since his last visit, but he stated that everything remained the same. Id. In addition, the Plaintiff had returned

to his psychiatrist after his girlfriend was allowed to attend the sessions.  Id.  Dr. Espeland noted that the Plaintiff appeared to be depressed.  Id.

On August 28, 2006, Dr. Espeland examined the Plaintiff.  [T. 359].  The Plaintiff's pain had stabilized, but he was very upset over his recent imprisonment for his failure to pay child support.  Id.  Dr. Espeland noted that the Plaintiff was depressed, appeared distressed, and answered questions in a long, rambling manner.  [T. 359-60].  The Plaintiff's medications were continued and he was referred to a physical therapist at Optimum Rehab, in Oakdale, Minnesota, to improve his abdominal pain.  Id.

On July 28, 2006, the Plaintiff was admitted to Regions Hospital, in St. Paul, Minnesota, by Richard J. Hilger, M.D. ("Dr. Hilger").  [T. 392-94].  The Plaintiff had an altered mental status at the time of admission, including tremors, hallucinations, and increased agitation.  [T. 392].  Dr. Hilger noted that the altered mental state was a symptom of his alcohol withdrawal.  [T. 393].  Dr. Hilger immediately began treating the Plaintiff for alcohol withdrawal.  Id.  On that same day, the Plaintiff had a CT scan of his head, which came back normal.  [T. 395-96].

Later that day, the Plaintiff was examined by Gretchen M. Zunkel, PhD ("Dr. Zunkel").  [T. 387].  Dr. Zunkel noted that the Plaintiff did not know why he was in

the hospital, but that he was not agitated.  Id.  In addition, Dr. Zunkel recorded that the

Plaintiff was depressed, crying, and delusional.  [T. 387-88].  Dr. Zunkel concluded

that the Plaintiff's mental state was a result of alcohol and opiate withdrawal, but that

the Plaintiff also suffered from severe depression.  [T. 391].  On July 30, 2006, the

Plaintiff was discharged from Regions Hospital by Dr. Hilger.  [T. 385].  Upon his

discharge, the Plaintiff was prescribed Atenolol, Oxycontin, and Depakote.[16]  [T. 386].


On September 25, 2006, the Plaintiff was seen by Dr. Espeland.  [T. 357].  The

Plaintiff's pain was still stable, and he reported that he had been going out for walks

and doing house work to stay active.  Id.  However, the Plaintiff admitted that he had

not attended, or scheduled, a physical therapy session since his last visit.  Id.  The

Plaintiff stated that he was still unemployed, but that he was searching for work.  Id.

Dr. Espeland noted that the Plaintiff's speech was clear and articulate, but that his

speech was pressured at times.  Id.  The Plaintiff also appeared to be depressed, and

had difficulty rising from a sitting position.  [T. 357-58].  In addition, Dr. Espeland

---

[16]Atenolol is "used in the treatment of hypertension[.]"  Dorland's Illustrated Medical Dictionary, at 1681 (31st Ed. 2007).  Depakote is the "trademark for a preparation of divalproex sodium."  Id. at 497.  Divalproex sodium is used in "the treatment of manic episodes associated with bipolar disorder and epileptic seizures[.]"  Id. at 565.

warned the Plaintiff that, if he did not schedule a physical therapy session prior to his next appointment with Dr. Espeland, he would reduce the Plaintiff's pain medications. [T. 358].

On October 12, 2006, the Plaintiff was examined by Dr. Zunkel. [T. 427]. Dr. Zunkel noted that the Plaintiff had been drinking since he left jail, and that he was unwilling to address his depression issues. Id. In addition, the Plaintiff reported that he suffered from insomnia, lack of energy, and motivation. Id. Dr. Zunkel noted that the Plaintiff's speech was normal, but that he was paranoid, anxious, and had poor insight and judgment. [T. 429]. The Plaintiff was diagnosed with a cognitive disorder, depression, and anti-social traits. Id. Dr. Zunkel recommend Remeron to improve the Plaintiff's insomnia and depression symptoms.[17] Id.

On December 7, 2006, the Plaintiff was seen by Dr. Zunkel. [T. 424]. The Plaintiff reported that the Remeron had not improved his symptoms. Id. However, Dr. Zunkel noted that the Plaintiff showed improvements in his insight and judgment, and he appeared to be goal oriented. [T. 425]. Dr. Zunkel decided to change the

---

[17]Remeron is the "trademark for a preparation of miratazpine." Dorland's Illustrated Medical Dictionary, at 1646 (31st Ed. 2007). Miratazpine is used for the treatment of depression. Id. at 1186.

Plaintiff's prescription to Zyprexa in order to see if it could improve the Plaintiff's insomnia and depressive symptoms.[18]  Id.

On December 13, 2006, the Plaintiff had a followup visit with Dr. Espeland. [T. 355].  The Plaintiff described his pain as stable and manageable.  Id.  The Plaintiff had started physical therapy, but was only going once every two (2) weeks instead of the prescribed twice a week.  Id.  Dr. Espeland noted that the Plaintiff was still somewhat depressed but was alert, oriented, and cooperative.  [T.355-56].

On February 22, 2007, the Plaintiff was seen by Dr. Zunkel for a psychiatric followup.  [T. 421].  The Plaintiff admitted that he was still depressed and emotional. Id.  The Plaintiff reported that the Zyprexa did not help his depressive symptoms.  [T. 422].  Dr. Zunkel decided to change the Plaintiff's medication and wrote him a prescription for Prozac.[19]  [T. 422].

On February 28, 2007, the Plaintiff was seen in the Emergency Room at HCMC, by Brian Clarkowski, M.D. ("Dr. Clarkowski").  [T. 336].  The Plaintiff

---

[18]Zyprexa is used for the "treatment of schizophrenia[.]"  Physician's Desk Reference, at 1867 (62nd ed. 2008).

[19]Prozac is the "trademark for preparations of fluoxetine hydrochloride." Dorland's Illustrated Medical Dictionary, at 1562 (31st Ed. 2007). Fluoxetine hydrochloride is used in the treatment of depression.  Id. at 730.

reported extreme abdominal pain which he related to his recurrent pancreatitis, and stated that his pain had worsened after a recent drinking binge. [T. 336-37]. Dr. Clarkowski noted that the Plaintiff was alert, and had a normal range of motion. Id. Shortly thereafter, the Plaintiff was admitted to the hospital at HCMC, and was seen by Sereen D. Sharp, M.D. ("Dr. Sharp"). [T. 317-19]. The Plaintiff complained of severe abdominal pain, which he believed was exacerbated as a result of a recent eleven (11) day drinking binge. [T. 317-18]. He admitted to taking pain medication in the past, but stated that he had not taken any recently. [T. 317]. Dr. Sharp observed that the Plaintiff was trembling, which was a side effect of his alcohol withdrawal. Id. He also noted that the Plaintiff was alert and oriented but also very anxious. [T. 318]. Dr. Sharp diagnosed the Plaintiff as suffering from a recurrent alcoholic pancreatitis and alcohol withdrawal. Id. The Plaintiff was given Dilaudid for his pain, and was treated for his alcohol withdrawal symptoms. [T. 319]. On March 6, 2007, the Plaintiff was discharged from the hospital, and was prescribed OxyContin and Dilaudid for pain management.

On March 22, 2007, the Plaintiff was examined by Dr. Zunkel. [T. 418]. The Plaintiff stated that he was feeling and sleeping better. Id. The Plaintiff claimed that his depression arose from feelings of hopelessness, because he was unable to work.

Id.  However, Dr. Zunkel noted that the Plaintiff appeared well-rested and had only minor depressive symptoms.  [T. 419].

On April 4, 2007, the Plaintiff was seen at HCMC by Sharon A. Jestus, R.N. ("Jestus").  [T. 313].  The Plaintiff reported that his pain had been reduced since his last hospitalization, and that he had remained sober for over a month.  Id.  On April 9, 2007, the Plaintiff returned to HCMC seeking a referral to the Fairview-University Pain Clinic ("the Minnesota Pain Clinic"), by Anders L. Carlson M.D. ("Dr. Carlson"), for his continuing abdominal pain.  [T. 311-312].  Dr. Carlson observed that the Plaintiff was alert with no signs of distress, but that his mood and affect were blunted.  [T. 312].  After his examination, Dr. Carlson referred the Plaintiff to the Minnesota Pain Clinic.  Id.

On April 23, 2007, the Plaintiff was examined at the Emergency Room at HCMC by Sabra Lofgren, M.D. ("Dr. Lofgren").  [T. 338].  The Plaintiff stated that he had drank a shot of vodka and, shortly thereafter, began experiencing severe abdominal pain and vomiting.  [T. 339].  After being treated with Dilaudid, the Plaintiff reported significant pain relief.  [T. 338-39].  The Plaintiff requested that his pain medications be refilled, but Dr. Lofgren informed him that he would have to receive a prescription from his primary care provider.  [T. 338].

On April 26, 2007, the Plaintiff was examined by Samuel K. Yue, M.D. ("Dr. Yue"), at the Minnesota Pain Clinic. [T. 382]. Dr. Yue noted that the Plaintiff had been referred to the clinic in the past for head and neck pain, but that his current complaint was for pain associated with his pancreatitis. Id. The Plaintiff stated that his pain was constant, and that he had bouts of vomiting and nausea because of his diet. Id. The Plaintiff admitted that he was depressed, but Dr. Yue noted that the Plaintiff was alert, oriented, and had good insight and judgment. [T. 382-83]. Dr. Yue did not prescribe the Plaintiff any pain medication because his past history of alcohol abuse put him at risk for narcotic abuse. [T. 384]. Dr. Yue also recommended that the Plaintiff read about the intrathecal pain pump.[20] Id.

On April 27, 2007, the Plaintiff was examined by Brita M. Hansen, M.D. ("Dr. Hansen"), at HCMC. [T. 309-10]. The Plaintiff stated that, although he had been seen by the Minnesota Pain Clinic, he still required a refill of his pain medication because Dr. Yue had refused to grant him a refill. [T. 310]. The Plaintiff stated that Dr. Yue did not refill his medication because of the Plaintiff's past history of substance abuse. Id. The Plaintiff also reported that, when he took his pain medication, he only

_____

[20]Intrathecal is defined as "within a sheath." Dorland's Illustrated Medical Dictionary, at 968 (31st Ed. 2007). An intrathecal pain pump is surgically inserted into the patient in order to manage chronic pain.

experienced moderate pain, and was able to carry out his daily activities.  Id.  Dr.

Hansen contacted Dr. Carlson, and both physicians agreed that the Plaintiff would

only receive his pain medication from Minnesota Pain Clinic.  Id.

On April 30, 2007, the Plaintiff contacted Dr. Yue complaining that the

physicians at HCMC would not prescribe him pain medication.  [T. 380].  Dr. Yue

stated that he would not take responsibility over the Plaintiff's pain management until

he determined whether the Plaintiff was a good candidate for the intrathecal pump.

Id. Dr. Yue offered to begin the process of a trial of intrathecal narcotic management,

and to conduct a subsequent psychological consultation, both of which were required

before any surgery would be performed .  Id.  However, until those steps were

completed, Dr. Yue refused to prescribe the Plaintiff any pain medication.  Id.

On May 1, 2007, the Plaintiff was seen in the Emergency Room at HCMC, by

Robert E. Collier, M.D. ("Dr. Collier").  [T. 332].  The Plaintiff complained of

abdominal pain which had worsened after he ran out of his pain medication.  [T. 326,

332].  In addition, the Plaintiff reported that he was scheduled to be evaluated for a

intrathecal pump, but that the evaluation was a few weeks away.  Id.  Dr. Collier

decided to prescribe the Plaintiff approximately one (1) week's worth of pain

medication.  Id.  Later that day, the Plaintiff returned to HCMC, and was examined

by Marydee C. Chamberlain ("Dr. Chamberlin").  [T. 329-30].  Dr. Chamberlin observed that the Plaintiff was very anxious and concerned, because he feared he would run out of pain medication prior to his appointment at the Minnesota Pain Clinic.  [T. 330].  The Plaintiff requested enough pain medication to make it to his appointment, which was thirteen (13) days away.  [T. 330].  Dr. Chamberlin refilled the Plaintiff's pain medication in order to ensure that he had enough until his appointment at the Minnesota Pain Clinic.  Id.

On May 10, 2007, the Plaintiff entered the Emergency Room at HCMC, where he complained of chronic abdominal pain as a result of his pancreatitis.  [T. 322].  The Plaintiff reported that his pain had increased because he had run out of his pain medication, but he stated that he was scheduled to get an intrathecal pump at the Minnesota Pain Clinic.  Id.  On May 11, 2007, Dr. Yue refused to prescribe the Plaintiff pain medication, and directed the Plaintiff to obtain his prescriptions from his primary care physician.  [T. 323-325].

On May 15, 2007, the Plaintiff was admitted to Regions Hospital, and examined by Miguel A. Ruizdiaz M. D. ("Dr. Ruizdiaz").  [T. 402-03].  The Plaintiff reported abdominal pain after eating a heavy fat-laden meal.  [T. 402].  The Plaintiff was prescribed Dilaudid for his pain.  [T. 403].  However, on May 16, 2007, the Plaintiff

told the nurses' station that he was feeling better and, shortly thereafter, he left the hospital prior to being properly discharged. [T. 401].

On May 24, 2007, the Plaintiff had a followup appointment with Dr. Yue. [T. 378]. The Plaintiff reported that the test dose of intrathecal narcotic had provided great pain relief, and that he had recently finished his psychological consult. Id. The Plaintiff also stated that his current prescription of Methadone made his pain barely manageable.[21] Id. Dr. Yue continued the Plaintiff's prescription for Methadone, and decided to schedule the Plaintiff for surgery to implant the intrathecal pump. Id.

On May 31, 2007, the Plaintiff had a followup visit with Dr. Zunkel. [T. 414]. The Plaintiff reported that his pain had stabilized after receiving a prescription for Methadone. Id. Dr. Zunkel noted that the Plaintiff was still depressed, anxious, and had a rambling thought process. [T. 415].

On July 19, 2007, the Plaintiff returned for a follow up with Dr. Yue. [T. 376]. Dr. Yue noted that the Plaintiff's surgery had been canceled because of the Plaintiff's low platelet count. Id. Dr. Yue provided the Plaintiff with additional information on

---

[21]Methadone hydrochloride possesses "pharmacologic actions similar to those of morphine and heroin," and is used "as an analgesic[.]" Dorland's Illustrated Medical Dictionary, at 1163 (31st Ed. 2007).

how to change his nutrition, so as to help his platelet count return to normal, and permit Dr. Yue to reschedule the surgery.  Id.

On August 9, 2007, the Plaintiff was examined by Dr. Zunkel.  [T. 410].  Dr. Zunkel reported that the Plaintiff was severely depressed as a result of the cancellation of his surgery.  Id.  She also reported that the Plaintiff had increased anxiety.  [T. 411].  Dr. Zunkel increased the Plaintiff's dosage of Prozac in order to reduce his anxiety and improve his mood.  Id.

2.    Medical Records Submitted After the Hearing.  On September 7, 2007, Dr. Zunkel sent a letter to the ALJ concerning the Plaintiff's medical conditions.  [T. 431].  Dr. Zunkel reported that the Plaintiff has traumatic brain injuries, a cognitive disorder, anxiety, depression, and anti-social tendencies.  Id.

3.    Assessments..  On August 8, 2005, the State agency consultant, Patrick Shields, M.D. ("Dr. Shields"), concluded that the current Record provided insufficient evidence to determine whether the Plaintiff suffered from a severe impairment.  [T. 231].  On August 15, 2005, the State agency consultant, Cliff Phibbs, M.D. ("Dr. Phibbs"), determined that the Plaintiff's past history of multiple factors, and surgeries, were not a severe impairment.  [T. 230].

On December 15, 2005, the State Agency consultant, Thomas Kuhlman, M.D. ("Dr. Kuhlman"), completed a psychiatric review technique form based upon the Plaintiff's alleged mental impairments. [T. 271]. Specifically, Dr. Kuhlman focused on the Plaintiff's alleged organic mental disorders and substance addiction disorders. Id.

With respect to the Plaintiff's organic mental disorders, Dr. Kuhlman noted that the Plaintiff had experienced memory impairment, changes in his personality, and disturbance in his mood. [T. 272]. Dr. Kuhlman concluded that all those changes could be attributed to the Plaintiff's substance abuse. [T. 279]. Dr. Kuhlman determined that, based upon the Plaintiff's impairments, he would have mild restrictions in his daily living activities, moderate limitations in maintaining social functioning, and in maintaining his concentration, persistence or pace, and no episodes of decompensation. [T. 281]. Dr. Kuhlman also noted that the Plaintiff's allegations of memory loss were likely not credible, since evidence in the Record revealed intact memory. [T. 283]. However, Dr. Kuhlman concluded that the Plaintiff could have a severe mental impairment, but that the evidence did not conclusively establish that he could not do a routine, or repetitive task job, with appropriate production levels. Id. .

On that same day, Dr. Kuhlman completed the Plaintiff's mental residual functional capacity assessment. [T. 285]. With respect to the Plaintiff's understanding and memory, Dr. Kuhlman determined that the Plaintiff would not be significantly limited in understanding, and remembering, short and simple instructions, locations, or work-like procedures. Id. However, Dr. Kuhlman found that the Plaintiff would have a moderate limitation in his ability to understand, and remember, detailed instructions. Id.

With respect to the Plaintiff's concentration and persistence, Dr. Kuhlman reported that the Plaintiff would have moderate difficulty in carrying out detailed instructions, in maintaining his attention and concentration for extended periods, in performing activities according to a schedule, or in maintaining regular attendance, being punctual, and maintaining a consistent pace. [T. 285-86].

In addition, Dr. Kuhlman noted that the Plaintiff would have moderate difficulty interacting with the public, but he found no significant limitation with the Plaintiff's ability to interact with his supervisors or co-workers. [T. 286]. Although the Plaintiff would have moderate difficulty interacting with the public, Dr. Kuhlman reported that the Plaintiff would be able to interact with the public for brief periods of time. [T. 287].

Lastly, Dr. Kuhlman observed that the Plaintiff would have moderate difficulty in tolerating, and responding to, normal work place stress, but he would be able "to handle the routine stresses of a routine, repetitive work setting." Id.

B.    Hearing Testimony. The Hearing on August 30, 2007, commenced with some opening remarks by the ALJ, in which he noted the appearances of the parties, and the failure of the Plaintiff to appear, for the Record. [T. 449]. The ALJ asked the Plaintiff's counsel if he knew the current whereabouts of the Plaintiff. Id. The Plaintiff's counsel explained that he did not know where the Plaintiff was and had only been informed, shortly before the Hearing, that the Plaintiff was unable to attend. Id. Although the Plaintiff was not present, the ALJ decided to continue the Hearing, and swore the Vocational Expert ("VE") to testify. [T. 451].

The ALJ started by posing a hypothetical, in which he asked the VE to assume an individual who was forty-six (46) years old, who had his GED, and the Plaintiff's past relevant work history and impairments, who was taking medications with the singular side-effect of sleepiness, who was able to do unskilled work with brief and superficial contact with the public, co-workers, and supervisors, and no rapid or frequent change in work routine. [T. 451-52]. The ALJ asked whether that individual would be able to return to the Plaintiff's past relevant work, and the VE responded

that the Plaintiff could not return to his past work, because his past work history involved skilled occupations. [T. 451].

The ALJ then asked the VE if there were other jobs in the regional or national economies, which could be performed by an individual with those limitations. [T. 452]. The VE explained that the individual could work at all levels of janitorial work, and that approximately 61,000 such positions existed in the State of Minnesota, and that the individual could work as a unskilled packager, and approximately 15,010 of those positions existed in the State of Minnesota. [T. 452-53].

The ALJ then revised the hypothetical, so as to include only those positions which involved light or medium janitorial or packaging work. [T. 453]. The VE testified that, for unskilled packagers, the number of positions were unchanged, for light janitorial work, there were approximately 15,000 positions, and for medium janitorial work 30,000 positions existed in the State of Minnesota. Id.

The ALJ then revised the hypothetical to include an individual who would be absent three (3) or more days per month, without scheduling those absences in advance. [T, 453-54]. The VE testified that there would be no full-time work available for such an individual in the regional or national economy. Id.

The ALJ then asked the VE if the addition of a cognitive disorder, not otherwise specified ("NOS"), a psychotic disorder, NOS, and alcohol dependence, would change her testimony. [T. 454]. The VE stated that those impairments would not significantly change her testimony, but that the individual would not be able to work as a janitor in an institution that served alcohol. Id. The ALJ then concluded his questioning of the VE.

The Plaintiff's counsel asked the VE whether an individual with the Plaintiff's relevant work experience, and impairments, would be able to find competitive employment if he were unable to have even brief or superficial contact with the public, co-workers, or supervisors. [T. 455]. The VE testified that the individual would be unable to find employment at the unskilled level. Id. The Plaintiff's counsel then asked that if that same individual could find competitive employment if he were unable to keep adequate pace and persistence so as to perform three (3) or four (4) step tasks. [T. 455-56]. The VE responded that the individual would not be able to do any work on a competitive basis. [T. 456]. The Plaintiff's counsel then concluded his questioning of the VE. Id.

C.    The ALJ's Decision.   The ALJ issued his decision on November 17, 2007. [T. 16-32].  As he was required to do, the ALJ applied the sequential, five-step

analytical process that is prescribed by Title 20 C.F.R. §404.1520.[22]  The ALJ first

found that the Plaintiff last met the insured status requirements for a period of

disability, and for DIB, on September 30, 2007.  [T. 20]. The ALJ also concluded that

the Plaintiff had not engaged in substantial gainful activity since his alleged onset date

of May 1, 2002.  Id.

---

[22]Under the five-step sequential process, the ALJ analyzes the evidence as
follows:

> (1) whether the claimant is presently engaged in a
> "substantial gainful activity;" (2) whether the claimant has
> a severe impairment that significantly limits the claimant's
> physical or mental ability to perform basic work activities;
> (3) whether the claimant has an impairment that meets or
> equals a presumptively disabling impairment listed in the
> regulations; (4) whether the claimant has the residual
> functional capacity to perform his or her past relevant
> work; and (5) if the claimant cannot perform the past work,
> the burden then shifts to the Commissioner to prove that
> there are other jobs in the national economy that the
> claimant can perform.

Simmons v. Massanari, 264 F.3d 751, 754-55 (8th Cir. 2001).

A claimant is disabled only if he is not engaged in substantial gainful activity; he has
an impairment that limits his ability to perform basic work activities; and his
impairment is either presumptively disabling, or he does not have the residual
functional capacity to perform his previous work, and he cannot perform other work
existing in the national economy.  Id. at 754.

Next, the ALJ examined whether the Plaintiff was subject to any severe physical impairments, which would substantially compromise his ability to engage in work activity.  Id.   After considering the Plaintiff's medical history, which included the reports of the Plaintiff's treating physicians, and the testimony adduced at the Hearing, the ALJ concluded that the Plaintiff was severely impaired by Hepatitis C, secondary to chronic alcoholism, alcohol-induced pancreatitis, alcohol dependence, and a cognitive disorder, NOS.  Id.  However, the ALJ determined that the Plaintiff's history of multiple fractures, which resulted from motor vehicle accidents, the alleged major depressive disorders, and the psychotic disorder, NOS, were non-severe impairments.  Id.

In reaching that conclusion, the ALJ first found that the Plaintiff's alleged fractures did not result in any significant limitations, which were supported by medical evidence.  Id.  Specifically, the ALJ noted that the medical record found that the Plaintiff had a full range of motion in his back, that his extremities were symmetrical in bulk, tone, and form, and that he was able to walk normally.  Id.  In addition, the ALJ gave great weight to the conclusion of the State Agency medical consultant, Dr. Schields, that the multiple fractures were a non-severe impairment.  Id.

The ALJ also determined that the Plaintiff's depression resulted in no significant limitations, and "that all significant limitation resulting from mental impairment is primarily due to [the Plaintiff's] alcohol dependence and abuse." Id. Specifically, the ALJ noted that Dr. Espeland reported normal or remarkable mental findings, from October 12, 2004, through October 20, 2005. Id. He also reported that Dr. Espeland found that the Plaintiff was alert, oriented, answered all questions, followed a conversation, and had an intact memory. Id. The ALJ discounted the Plaintiff's hospitalization, in October of 2005, by noting that the Plaintiff was hospitalized as a result of the his substance abuse, and that the Plaintiff had not been taking his prescribed depression medication. [T. 21]. The ALJ further noted that, although the Plaintiff was reported as being slightly depressed, he was cooperative and had a logical and coherent thought process. Id.

In addition, the ALJ discounted both Dr. Espeland's and Dr. Karayusuf's finding, that the Plaintiff was depressed, as those findings were directly contradicted by the Plaintiff's daily activities, which included "cooking, grocery shopping with his girlfriend, cleaning the floor, doing laundry, attending AA meetings once a week, and concentrating on TV shows." Id.

Moreover, the ALJ noted that the Plaintiff had admitted to Dr. Karayusuf that, prior to 2003, he had drank approximately a gallon of alcohol per day, and usually relapsed every six (6) months. Id. The ALJ observed that it appeared that the Plaintiff continued to abuse alcohol, as evidenced by his hospitalization on July 28, 2006, and March 1, 2007, for alcohol withdrawal symptoms. Id. Since the Plaintiff continued to abuse alcohol, the ALJ gave little weight to Dr. Espeland's observation that the Plaintiff had a flat affect, and a depressed mood, and Dr. Zunkel's report that the Plaintiff had an impaired orientation, insight, judgment, and circumstantial thought process. Id.

Moreover, the ALJ recognized that the Plaintiff's depressive symptoms improved with medication. Id. On March 22, 2007, Dr. Zunkel reported that the Plaintiff's depressive symptoms were minor, and had improved when Ambien and Vistaril were administered.[23] Id. In particular, the ALJ noted that Dr. Zunkel found the Plaintiff to be goal-oriented, to have improved insight, judgment, and

_____

[23]Ambien is used "for the short-term treatment of insomnia characterized by difficulties with sleep initiation." Physician's Desk Reference, at 2799 (62nd ed. 2008). Vistaril is the "trademark for preparations of hydroxyzine." Dorland's Illustrated Medical Dictionary, at 2095 (31st Ed. 2007). Hydroxyzine is "a piperzine derivative with central nervous system depressant, antispasmodic, antihistaminic, and antifibrillatory actions." Id. at 896.

circumstantial thought process, and to have normal speech.  Id.  The ALJ concluded that, since the Plaintiff's depression placed no significant restrictions on him, it was a non-severe impairment.  Id.

With respect to the Plaintiff's psychotic disorder, the ALJ noted that the Plaintiff had "been diagnosed with hallucinations, delusions or paranoia, but the medical evidence shows that these symptoms lasted only for short periods of time and were related to the [Plaintiff's] alcohol abuse * * *."  [T. 21-22].  He concluded "that any psychotic disorder was non-severe as it lasted less than 12 months and was related to alcohol abuse or substance abuse."  [T. 22].  Accordingly, the ALJ found that the psychotic disorder was not a severe impairment.  Id.

At the Third Step, the ALJ compared the Plaintiff's severe impairments with the impairments contained in Appendix 1, Subpart P, of the Regulations.  See, Title 20 C.F.R. §404.1520(d).  He noted that, in order to meet the paragraph B criteria for either Listings 12.02, or 12.09, the Plaintiff had to satisfy at least two (2) of the criteria, including: marked restriction of daily activities; marked difficulty in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of an extended duration.  Id.

With respect to daily living, the ALJ determined that the Plaintiff's daily activities included cooking, cleaning, grocery shopping, and concentrating on television shows, which reflected only a mild restriction on his daily activities.  Id.

The ALJ concluded that the Plaintiff exhibited a moderate limitation with respect to his ability to maintain social functions.  Id.  Although the Plaintiff's speech was normal, clear, and articulate, the ALJ found a moderate restriction "as there was some evidence of long rambling answers to questions."  Id.

In addition, the ALJ concluded that the Plaintiff had moderate difficulty in maintaining his concentration, persistence, or pace.  Id.  He acknowledged that the Record contained evidence in direct contradiction to that conclusion, but he granted the Plaintiff the benefit of the doubt as to his claim that he had such a limitation.  Id.  Lastly, the ALJ noted that the Plaintiff had experienced one (1) or two (2) episodes of decompensation.  [T. 23].

The ALJ concluded that the functional limitations, which resulted from the Plaintiff's mental impairments, did not satisfy the requirements of the "B" criteria, or the requirements of the "C" criteria.  Id.  As a consequence, the ALJ found that the Plaintiff did not have either a mental or physical impairment that met the Listings criteria.  Id.

The ALJ proceeded to determine whether the Plaintiff retained the RFC to engage in the duties required by his past relevant work, or whether he was capable of engaging in other work, which existed in significant numbers in the national economy. Id. RFC is defined in the Regulations as the most an individual can still do after considering the effects of physical limitations that can affect the ability to perform work-related tasks. See, Title 20 C.F.R. §404.1545, and Social Security Ruling 96-8p. The ALJ recognized that, in order to arrive at the Plaintiff's RFC, he was obligated to consider all of the symptoms, including the Plaintiff's subjective complaints, and that those complaints were to be evaluated under the standard enunciated in Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984), Social Security Ruling 96-7p, and Title 20 C.F.R. §404.1529.

After considering the entire Record, including the testimony adduced at the Hearing, the opinions of the Plaintiff's treating physicians, the objective medical evidence, and the Plaintiff's subjective complaints, the ALJ determined the Plaintiff's RFC to be as follows:

> [The Plaintiff] has the residual functional capacity to
> perform medium work except that the [Plaintiff] is limited

> to unskilled work with brief and superficial contact with
> public, co-workers and supervisors, and requires no rapid
> or frequent changes to work routine.

[T. 24].

The ALJ concluded that the RFC was consistent with the weight of the Record, but was inconsistent with the Plaintiff's assertion that he had been disabled, by his mental impairments, from all work activity. Id.

In determining the Plaintiff's RFC, the ALJ first considered the Plaintiff's claims that he cannot work because of his fractures, surgeries, pancreatitis, and attention deficit hyperactivity disorder, and that he was unable to stand for long periods of time, perform repetitive movements, or bend his back. [T. 25]. However, the ALJ concluded that the Plaintiff's greatest health issue was his "history of heavy drinking that has resulted in pancreatitis and Hepatitis C." Id.

In support of this conclusion, the ALJ noted that the Plaintiff complained of abdominal pain, during a visit to Dr. Espeland on November 30, 2005. Id. The ALJ found that, during the examination, Dr. Espeland observed that the Plaintiff had an intact memory, full range of motion in his back, had a normal gait, and could walk on his heels and toes. Id. The ALJ reported that Dr. Espeland diagnosed the Plaintiff "with abdominal pain secondary to chronic pancreatitis, which was alcoholic in

nature." Id. On March 5, 2004, the Plaintiff complained of abdominal pain, but the ALJ observed that the Plaintiff was able to engage in conversation, had an appropriate affect, and an intact memory.

The ALJ noted that, during an appointment on October 14, 2004, when the Plaintiff was examined by Dr. Espeland for abdominal pain, the Plaintiff was not drinking, was attending AA meetings, and was working twenty-five (25) to thirty (30) hours a week while looking for a full-time job. Id. The ALJ also noted Dr. Espeland's report that the Plaintiff was alert, oriented, answered questions appropriately, had an appropriate affect, and an intact memory . Id. The ALJ found particular significance in the fact that Dr. Espeland had made a similar finding on March 16, 2005, even though the Plaintiff's pain had increased. Id.

The ALJ also noted that, during a followup visit on October 20, 2005, Dr. Espeland reported that the Plaintiff's pain had decreased, that he could move from a sitting to standing position without difficulty, had clear and articulate speech, intact memory, and was pleasant and cooperative. [T. 25-26]. However, the ALJ observed that, on October 22, to October 24, 2005, the Plaintiff was hospitalized with abdominal pain after a four (4) day drinking binge. [T. 26]. During that hospital stay, the Plaintiff admitted that he had not been taking his depression medication, and he

was observed as only being slightly depressed. Id. In addition, the ALJ noted that the Plaintiff was cooperative, had unremarkable speech and motor behavior, and was able to think in a logical and coherent manner. Id.

On February 28, 2007, the Plaintiff complained of severe abdominal pain, after another binge drinking episode. [T. 27]. The ALJ observed that the Plaintiff was subsequently admitted to the hospital, and that his discharge notes revealed that the Plaintiff had been drinking heavily for eleven (11) days. Id. On April 22, 2007, the Plaintiff requested medical treatment for alcoholic pancreatitis, and abdominal pain. Id. The Plaintiff stated that he had started experiencing severe abdominal pain shortly after drinking a shot of vodka. Id.

The ALJ also remarked that, during the Plaintiff's visit with Dr. Yue on April 26, 2007, the Plaintiff stated that he had been sober since February 28, 2007. Id. Next, the ALJ noted that the Plaintiff was scheduled for surgery, in order to insert an Intrathecal pump, on May 16, 2007, but that, on May 1, and May 11, 2007, the Plaintiff sought medical treatment for abdominal pain, and subsequently, on May 15, 2007, was hospitalized. Id. The ALJ observed that the hospital notes disclosed that the pancreatitis was almost entirely related to the Plaintiff's alcohol abuse. Id.

The ALJ determined that the Plaintiff should be limited to medium work as a result of his alcohol dependence, and its affect on his pancreatitis, and Hepatitis C. Id. In addition, the ALJ determined that the Plaintiff is "limited to unskilled work with brief and superficial contact with the public, co-workers supervisors, and requires no rapid or frequent changes to work routine." Id. The ALJ based that decision on some evidence of rambling answers to questions, with an angry mood, as well as the observations of Dr. Karayusuf, and Dr. Zunkel. Id.

The ALJ noted that Dr. Karayusuf examination revealed that the Plaintiff had fair immediate digit recall, dull normal intelligence, intact recent and remote memory, could subtract fifteen (15) minus six (6) accurately, could name the past five (5) Presidents, and recall three (3) unrelated objects after five (5) minutes. [T. 28]. However, the Plaintiff could not subtract serial sevens, and "related in a subdued, spontaneous and tearful manner with minimal insight, and had a coherent, rambling, tangential and circumstantial speech." Id. Despite the Plaintiff's inconsistency, Dr. Karayusuf opined that the Plaintiff was moderately to severely depressed but was able to "understand, retain and follow simple instructions," but could not "maintain pace and persistence[.]" Id.

With respect to Dr. Zunkel, the ALJ noted that, on October 12, 2006, Dr. Zunkel described the Plaintiff as angry, anxious, and having a neutral affect with impaired orientation, and poor judgment and orientation. Id. However, by December 7, 2006, the Plaintiff was goal oriented, with improved insight and judgment. Id. In addition, the ALJ noted that, on February 22, 2007, Dr. Zunkel reported that the Plaintiff appeared disheveled and anxious, and exhibited slow behavior and a circumstantial thought process with loose association. Id. However, the ALJ noted that those findings occurred shortly before the Plaintiff was hospitalized for alcohol withdrawal symptoms. Id.

Based upon the weight of the Record, the ALJ concluded that the Plaintiff's "medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that [the Plaintiff's] statements concerning the intensity, persistence and limiting effects of those symptoms are not entirely credible." [T. 28-29].

The ALJ next considered the opinion evidence of Record. [T. 29]. Specifically, the ALJ gave great weight to Dr. Zunkel's findings. Id. He gave some weight to Dr. Zunkel's opinion of September 7, 2007, that the Plaintiff suffered from a traumatic brain injuries, and a cognitive disorder, as the ALJ found that diagnosis to be

"consistent with a cognitive disorder or brain injury resulting from a long history of alcohol abuse." Id. However, the ALJ found that the Record did not reveal "the existence of a cognitive disorder, or a brain injury per se," which was consistent with the repeated reports that the Plaintiff had unremarkable mental findings, and an intact memory. Id.

The ALJ also gave little weight to Dr. Zunkel's opinion that Dr. Karayusuf's report was congruent with the Plaintiff's mental status. Id. Dr. Karayusuf opined that the Plaintiff would be unable to maintain pace, concentration, or persistence, and would be unable to interact with the public, and his fellow co-workers, because of his rambling speech, and the severity of his depression. Id. However, the ALJ found that Dr. Karayusuf's opinion was "inconsistent with his own findings * * * and with [the Plaintiff's] demonstrated ability to engage in and to follow a conversation * * * with clear, articulate, * * * unremarkable * * * and normal speech." Id. In addition, the ALJ noted that Dr. Zunkel's recent examination of the Plaintiff revealed that his mood had stabilized, and that he had normal speech. Id.

The ALJ also granted little weight to Dr. Shields' finding that there was, on August 8, 2005, insufficient evidence of a substance abuse disorder. Id. The ALJ stated that additional evidence, that was received into the Record, demonstrated that

the Plaintiff's alcohol abuse disorder is a severe impairment.  Id.  In addition, the ALJ

gave little weight to Dr. Shields' opinion that the Plaintiff's pancreatitis and chronic

Hepatitis were non-serve impairments, since later evidence demonstrated the severity

of those conditions.  Id.

Proceeding to the Fourth Step, the ALJ determined that the Plaintiff would be

unable to perform his past relevant work as a tool salesman, roofer, cashier, or supply

clerk.  [T. 29-30].  In reaching that conclusion, the ALJ relied upon the testimony of

the VE.  Id.

However, at the Fifth Step, the ALJ concluded that a significant number of jobs

existed, in the national and regional economies, which the Plaintiff could perform.

[T.30-31].  The ALJ recounted the VE's testimony, that persons with the Plaintiff's

functional limitations could work as a janitor, or as a packager, with a light or medium

level of exertion.  [T. 31].  The ALJ also noted that the VE testified that there existed

approximately 45,000 janitorial jobs, and 15,010 packager jobs, in the economy of the

State of Minnesota.  Id.  Finding the VE's testimony to be credible, and persuasive,

the ALJ determined that there existed a significant number of jobs that the Plaintiff

could perform.  Id.  As a result, the ALJ concluded that the Plaintiff was not disabled.

Id.

IV.  Discussion

A.    Standard of Review.  The Commissioner's decision must be affirmed if it conforms to the law and is supported by substantial evidence on the Record as a whole.  See, Title 42 U.S.C. §405(g); see also, Moore ex rel. Moore v. Barnhart, 413 F.3d 718, 721 (8th Cir. 2005); Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002); Qualls v. Apfel, 158 F.3d 425, 427 (8th Cir. 1998).  This standard of review is more than a mere search for the existence of evidence supporting the Commissioner's decision.  See, Morse v. Shalala, 32 F.3d 1228, 1229 (8th Cir. 1994), citing Universal Camera Corp. v. NLRB, 340 U.S. 474, 488-91 (1951).  Rather, the substantiality of the evidence must take into account whatever fairly detracts from its weight, see, Cox v. Apfel, 160 F.3d 1203, 1206 (8th Cir. 1998); Moore ex rel. Moore v. Barnhart, supra at 721, and the notable distinction between "substantial evidence," and "substantial evidence on the record as a whole," must be observed.  See, Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998).  On review, a Court must take into consideration the weight of the evidence, apply a balancing test, and determine whether substantial evidence in the Record as a whole supports the findings of fact upon which a Plaintiff's claim was denied.  See, Loving v. Secretary of Health and Human Services,

16 F.3d 967, 969 (8th Cir. 1994); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989).

Substantial evidence means more than a mere scintilla; it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. See, Neal ex rel. Walker v. Barnhart, 405 F.3d 685, 688 (8th Cir. 2005), citing Nelson v. Sullivan, 966 F.2d 363, 366 n.6 (8th Cir. 1992); Moad v. Massanari, 260 F.3d 887, 890 (8th Cir. 2001). Stated otherwise, substantial evidence "is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Cox v. Barnhart, 471 F.3d 902, 906 (8th Cir. 2006). Therefore, "'[i]f, after review, we find it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, we must affirm the denial of benefits.'" Vandenboom v. Barnhart, 421 F.3d 745, 749 (8th Cir. 2005), quoting Eichelberger v. Barnhart, 390 F.3d 584, 589 (8th Cir. 2004); Howard v. Massanari, 255 F.3d 577, 581 (8th Cir. 2001), quoting Mapes v. Chater, 82 F.3d 259, 262 (8th Cir. 1996). Under this standard, we do not reverse the Commissioner even if this Court, sitting as the finder-of-fact, would have reached a contrary result. See, Owens v. Astrue, 551 F.3d 792, 798 (8th Cir. 2008)("The decision of the ALJ 'is not outside the 'zone of choice' simply because we might have

reached a different conclusion had we been the initial finder of fact.'"), quoting Bradley v. Astrue, 528 F.3d 1113, 1115 (8th Cir. 2007), quoting, in turn, Nicola v. Astrue, 480 F.3d 885, 886 (8th Cir. 2007); Harris v. Shalala, 45 F.3d 1190, 1193 (8th Cir. 1995).

Consequently, the concept of substantial evidence allows for the possibility of drawing two inconsistent conclusions, and therefore, embodies a "zone of choice," within which the Commissioner may decide to grant or deny benefits without being subject to reversal on appeal. See, Hacker v. Barnhart, 459 F.3d 934, 936 (8th Cir. 2006), citing Culbertson v. Shalala, 30 F.3d 934, 939 (8th Cir. 1994); see also, Haley v. Massanari, 258 F.3d 742, 746 (8th Cir. 2001)("[A]s long as there is substantial evidence in the record to support the Commissioner's decision, we will not reverse it simply because substantial evidence exists in the record that would have supported a different outcome, Shannon v. Chater, 54 F.3d 484, 486 (8th Cir. 1995), or 'because we would have decided the case differently.'"), quoting Holley v. Massanari, 253 F.3d 1088, 1091 (8th Cir. 2001). Our review of the ALJ's factual determinations, therefore, is deferential, and we neither reweigh the evidence, nor review the factual record de novo. See, Hilkemeyer v. Barnhart, 380 F.3d 441, 445 (8th Cir. 2004); Flynn v.

Chater, 107 F.3d 617, 620 (8th Cir. 1997); Roe v. Chater, 92 F.3d 672, 675 (8th Cir. 1996).

B.     Legal Analysis.  In support of his Motion for Summary Judgment, the Plaintiff advances the following arguments:

1.     That the ALJ failed to give proper weight to the Plaintiff's treating physicians;

2.     That the ALJ's hypothetical question to the VE failed to include all of the Plaintiff's limitations; and

3.     That the ALJ failed to follow the Commissioner's regulations when he denied the Plaintiff's request for a continuation and improperly issued a notice to show cause.

Plaintiff's Memorandum in Support, Docket No. 12, at 9-16.

We address these arguments in turn.

1.     Whether the ALJ Failed to Honor the Treating Physician Rule.

a.     Standard of Review.  When a case involves medical opinion -- which is defined as "statements from physicians and psychologists or other acceptable medical sources" -- the opinion of a treating physician must be afforded substantial weight.  Title 20 C.F.R. §§404.1527; see also, Forehand v. Barnhart, 364 F.3d 984, 986 (8th Cir. 2004); Burress v. Apfel, 141 F.3d 875, 880 (8th Cir. 1998);

Grebenick v. Chater, 121 F.3d 1193, 1199 (8th Cir. 1997); Pena v. Chater, supra at 908. Nevertheless, an opinion rendered by a claimant's treating physician is not necessarily conclusive. See, Forehand v. Barnhart, supra at 986 ("A treating physician's opinion is generally entitled to substantial weight, although it is not conclusive and must be supported by medically acceptable clinical and diagnostic data."), quoting Kelley v. Callahan, 133 F.3d 583, 589 (8th Cir. 1998).

An ALJ may discount a treating physician's medical opinion, and adopt the contrary medical opinion of a consulting physician, when the treating source's statements are conclusory, unsupported by medically acceptable clinical or diagnostic data, or when the ALJ's determination is justified by substantial evidence in the Record as a whole. See, Rogers v. Chater, 118 F.3d 600, 602 (8th Cir. 1997); Pena v. Chater, supra at 908; Ghant v. Bowen, 930 F.2d 633, 639 (8th Cir. 1991); Kirby v. Sullivan, 923 F.2d 1323, 1328 (8th Cir. 1991); Ward v. Heckler, 786 F.2d 844, 846 (8th Cir. 1986).

The opinion of a treating physician may also be discounted if other assessments are supported by better, or by more thorough, medical evidence. See, Rogers v. Chater, supra at 602; Ward v. Heckler, supra at 846. In short, the ALJ is not required to believe the opinion of a treating physician when, on balance, the medical evidence

convinces him otherwise.  Id.  As but one example, a treating physician's opinion is not entitled to its usual substantial weight when it is, essentially, a vague, conclusory statement.  See, Piepgras v. Chater, 76 F.3d 233, 236 (8th Cir. 1996), citing Thomas v. Sullivan, 928 F.2d 255, 259 (8th Cir. 1991).  Rather, conclusory opinions, which are rendered by a treating physician, are not entitled to greater weight than any other physician's opinion.  Id.; Metz v. Shalala, 49 F.3d 374, 377 (8th Cir. 1995).

The Code of Federal Regulations sets forth additional factors to assist the ALJ in determining what weight should be accorded to the opinion of a given physician, including a treating physician.  The Regulations encourage the ALJ to afford more weight to those opinions which are "more consistent with the record as a whole."  See, Title 20 C.F.R. §404.1527(d)(4)).  More weight is also to be extended to "the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist."  See, Title 20 C.F.R. §404.1527(d)(5).  When presented with a treating physician's opinion, the ALJ is obligated to examine the nature and extent of the treatment relationship, attributing weight to such an opinion that is proportionate to the knowledge that the medical provider has about the claimant's impairments.  See, Title 20 C.F.R. §404.1527(d)(2)(ii).  Further, the Regulations make clear that the opinions of treating physicians, on questions reserved

for the Commissioner -- such as whether a claimant is disabled, or is unable to work -- are not to be given any weight by the ALJ. See, <u>Title 20 C.F.R. §404.1527(e)(1)</u>.

       b.    <u>Legal Analysis</u>. The Plaintiff argues that the ALJ erred in failing to give substantial weight to the opinions of Dr. Karayusuf, one of his treating physicians, and Dr. Zunkel, his treating psychologist. In addition, the Plaintiff argues that the ALJ was required to contact Drs. Karayusuf and Zunkel, in order to seek additional evidence, or clarification, before issuing his decision. See, <u>Title 20 C.F.R. §404.1512(e)</u>. We disagree, for we find that, when the Record is viewed in its fullness, the ALJ rejected the opinions of Drs. Karayusuf and Zunkel to the extent that they were not supported by substantial evidence.

As previously noted, the ALJ need not give any weight to a consultative, or a treating physician's conclusory statements, regarding total disability. See, <u>Title 20 C.F.R. §404.1527(e)(1)</u>; <u>Rogers v. Chater</u>, supra at 602. If justified by substantial evidence in the Record as a whole, the ALJ can discount the examining, or treating physician's opinion. See, <u>Rogers v. Chater</u>, supra at 602; <u>Ward v. Heckler</u>, supra at 846. With respect to the Plaintiff's mental limitations, it is important to note that, here, the ALJ did not entirely disregard the opinions of Drs. Karayusuf or Zunkel.

Rather, he determined that parts of their opinions, as to the Plaintiff's disability, were inconsistent with the Record as a whole.

With respect to Dr. Karayusuf, the ALJ was not required to give Dr. Karayusuf's opinion substantial weight because he cannot be characterized as the Plaintiff's treating physician. "In determining how much weight to give a treating physician's opinion, the ALJ must consider the length of the treatment relationship and the frequency of examinations." Hayes v. Astrue, 569 F. Supp.2d 910, 925 (E.D. Mo. 2008), citing Casey v. Astrue, 503 F.3d 687, 692 (8th Cir. 2008), citing; Title 20 C.F.R. §404.1527(d)(2)(i)("When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the source's opinion more weight than we would give it if it were from a nontreating source.").

In this case, Dr. Karayusuf examined the Plaintiff on only one occasion. [ T. 221-23]. Therefore, based upon the minimal treatment relationship, and the absence of any subsequent examinations, Dr. Karayusuf cannot be considered the Plaintiff's treating physician, and accordingly, the ALJ was not required to give Dr. Karayusuf's opinion substantial weight. See, Conklin v. Barnhart, 206 Fed.Appx. 633, 637 (8th Cir. 2006)(concluding that the ALJ had properly discounted the physician's opinion

where the physician had seen the plaintiff only once); <u>Doyal v. Barnhart</u>, 331 F.3d 758, 763 (10th Cir. 2003)("A physician's opinion is therefore not entitled to controlling weight on the basis of a fleeting relationship," and therefore "the opinion of an examining physician who only saw the claimant once is not entitled to the sort of deferential treatment accorded to a treating physician's opinion."), quoting <u>Reid v. Charter</u>, 71 F.3d 372, 374 (10th Cir. 1995); <u>Branson v. Callahan</u>, 14 F. Supp.2d 1089, 1098 (N.D. Iowa 1998)(finding that a physician was not a treating physician when the physician saw the plaintiff only twice in two (2) years).

Even if we were to find that Dr. Karayusuf could be characterized as a treating physician, we would find that the ALJ discounted only those parts of Dr. Karayusuf's opinion that were inconsistent with the Record as a whole. The ALJ gave great weight to Dr. Karayusuf's finding that the Plaintiff had fair immediate digit recall, an appropriate affect, a dull normal intelligence, an intact memory, and that the Plaintiff was moderately to severely depressed, and spoke in a coherent, rambling form of speech. [T. 23]. However, the ALJ gave no weight to Dr. Karayusuf's opinion that the Plaintiff "could not maintain persistence and pace, and interact with fellow co-workers, supervisors and the public due to his rambling speech and the severity of his depression." <u>Id.</u> The ALJ noted that Dr. Karayusuf's own findings undermined his

final conclusion, because Dr. Karayusuf observed that the Plaintiff could engage and follow a conversation with clear, articulate, unremarkable, and normal speech.  Id.

The ALJ also found that Dr. Karayusuf's conclusion, that the Plaintiff's alcohol dependance was in remission, was contradicted by the Record as a whole, which revealed several subsequent hospitalizations for the symptoms of alcohol withdrawal. Id. Lastly, the ALJ gave no weight to Dr. Karayusuf's opinion, that the Plaintiff "had a major recurrent moderate to severe depression and an organic personality disorder," since those findings were undermined by Dr. Zunkel's subsequent, clinical observation, that the Plaintiff's depressive symptoms were minor, and that his mood was stable.  Id.

With respect to Dr. Zunkel, the ALJ afforded some weight to Dr. Zunkel's opinion of September 7, 2007, that the Plaintiff suffered from traumatic brain injuries, and a cognitive disorder, as those findings were consistent with the Plaintiff's alcohol abuse .  [T. 29].   However, the ALJ noted that the Record did not reveal a brain injury, or a cognitive disorder per se, which were also in direct conflict with the repeated reports of unremarkable mental findings.  Id.

The ALJ also gave little weight to Dr. Zunkel's opinion, that Dr. Karayusuf's report was consistent with the Plaintiff's mental status.  Id.  The ALJ observed that Dr.

Karayusuf's report determined that the Plaintiff would be unable to maintain pace and persistence, nor would he be able to interact with his co-workers, or the public, because of the severity of his depression and his rambling speech. Id. The ALJ contrasted those findings to one (1) of Dr. Zunkel's recent examinations, in which she reported that the Plaintiff's mood was stable, and that he had normal speech. Id. The ALJ also rejected Dr. Zunkel's opinion, that the Plaintiff might not be drinking, because the Record revealed that, on May 17, 2007, the Plaintiff was once again diagnosed with alcohol-related pancreatitis. Id.

Under the circumstances presented here, we are aware of no authority that requires the ALJ to abdicate his obligation to independently assess credibility, and to critically weigh conflicting medical opinions, simply because a medical source has expressed, in solely conclusory terms, opinions as to the Plaintiff's inability to work. See, e.g., Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005)("A medical source opinion that an applicant is 'disabled' or 'unable to work,' however, involves an issue reserved for the Commissioner and therefore is not the type of 'medical opinion' to which the Commissioner gives controlling weight."), citing Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004); Vandenboom v. Barnhart, supra at 750 ("Dr. Hines [i.e., the claimant's treating neurologist] was of the opinion that Vandenboom would not

be able to return to work, but a treating physician's opinion that a claimant is not able to return to work 'involves an issue reserved for the Commissioner and therefore is not the type of "medical opinion" to which the Commissioner gives controlling weight."), quoting Ellis v. Barnhart, supra at 994. As a consequence, we find that the ALJ fulfilled his responsibilities, under the Regulations, by explaining, and justifying, the weight that was given to each of the medical source opinions, and the reasons why he found some opinions more probative than others. See, Title 20 C.F.R. §404.1527(f)(2)(ii).

We are mindful that the ALJ was confronted by competing and conflicting medical opinions, as professed by consultative, and treating physicians and, under those circumstances, the ALJ's obligation is to weigh the competing evidence, and draw findings based upon the substantiality of the evidence of Record. Consistent with his "function to resolve conflicts among the various treating and examining physicians," Tindell v. Barnhart, 444 F.3d 1002, 1004 (8th Cir. 2006), quoting Vandenboom v. Barnhart, supra at 749-50, we find that the ALJ thoroughly reviewed the entirety of the Record, and based his resolution of the medical disputes on substantial evidence. Of course, the question is not whether, had we faced the medical opinion evidence as a matter of first impression, we might have reached a different

result, for we simply acknowledge that the resolution that the ALJ reached was well within the Commissioner's "zone of choice." See, <u>Vandenboom v. Barnhart</u>, supra at 749, citing, and quoting, <u>Eichelberger v. Barnhart</u>, supra at 589.

In sum, where, as here, medical evidence conflicts, the obligation of the ALJ is to consider "all of the medical evidence, * * * weigh this evidence in accordance with the applicable standards, and attempt to resolve the various conflicts and inconsistencies in the record." <u>Hudson ex. rel. Jones v. Barnhart</u>, 345 F.3d 661, 667 (8th Cir. 2003). After close review, we are satisfied that the ALJ properly weighed the medical opinions in the Record, and afforded those opinions the weight they deserved, when considered on the Record as a whole. See, <u>Bentley v. Shalala</u>, 52 F.3d 784, 785 (8th Cir. 1995)("It is the ALJ's function to resolve conflicts among 'the various treating and examining physicians.'"), quoting <u>Cabrnoch v. Bowen</u>, 881 F.2d 561, 564 (8th Cir.1989).

Moreover, the ALJ did not find ambiguity in either Dr. Karayusuf's, or Dr. Zunkel's medical opinion, nor did he express any view that their opinions required clarification but, rather, simply concluded that certain of those opinions were not supported by the Record on the whole. [T. 23, 29]. Consequently, he was not required to contact Dr. Karayusuf, or Dr. Zunkel, notwithstanding the Plaintiff's

assertion to the contrary.  See, <u>20 C.F.R. §§404.1512(e)-(e)(1)</u>; <u>Hacker v. Barnhart</u>, supra at 938 ("The regulations provide that the ALJ should recontact a treating physician when the information the physician provides is inadequate for the ALJ to determine whether the applicant is actually disabled," but "[t]he regulations do not require an ALJ to recontact a treating physician whose opinion was inherently contradictory or unreliable."); <u>Goff v. Barnhart</u>, 421 F.3d 785, 791 (8th Cir. 2005) ("While the ALJ has an independent duty to develop the record in a social security disability hearing, the ALJ is not required 'to seek additional clarifying statements from a treating physician unless a crucial issue is undeveloped.'"), quoting <u>Stormo v. Barnhart</u>, 377 F.3d 801, 806 (8th Cir. 2004).  As a consequence, we find no reversible error in the ALJ's treatment, and resolution, of the competing medical opinions.

2. <u>Whether the ALJ Correctly Formulated the Hypothetical for the VE</u>.

a. <u>Standard of Review</u>.  It is well-established that a hypothetical question must precisely set out all of the claimant's impairments that the ALJ accepts as supported by the Record.  See, <u>Hallam v. Barnhart</u>, 2006 WL 3392179 at *2 (8th Cir., November 27, 2006)(ALJ must include in hypothetical those limitations that he finds consistent, credible, and supported Ry record as a whole); <u>Lacroix v.</u>

Barnhart, 456 F.3d 881, 889 (8th Cir. 2006). "A hypothetical question posed to the vocational expert is sufficient if it sets forth impairments supported by substantial evidence in the record and accepted as true." Goff v. Barnhart, supra at 794, quoting Hunt v. Massanari, 250 F.3d 622, 625 (8th Cir. 2001), citing, in turn, Prosch v. Apfel, 201 F.3d 1010, 1015 (8th Cir. 2000); see also, Grissom v. Barnhart, supra at 837.

"A proper hypothetical question presents to the vocational expert a set of limitations that mirror those of the claimant." Harwood v. Apfel, 186 F.3d 1039, 1044 (8th Cir. 1999), citing Hutton v. Apfel, 175 F.3d 651, 656 (8th Cir. 1999). The hypothetical does not need to include medical terminology from the Record, but should capture the "concrete consequences" of the supported impairments. Lacroix v. Barnhart, supra at 889, citing Roe v. Chater, supra at 676-77; see also, Gill v. Barnhart, 2004 WL 1562872 *7 (D. Neb., July 13, 2004); Hunt v. Massanari, supra at 625.

    b. Legal Analysis. The Plaintiff alleges that the ALJ posed a flawed hypothetical to the VE, which failed to capture the concrete consequences of the Plaintiff's alleged disabilities. See, Plaintiff's Memorandum, supra at 13-14.. The argument is based solely upon the Plaintiff's contention that the

ALJ formulated an improper RFC, by disregarding certain of the medical opinions of Drs. Karayusuf and Zunkel.

As we have already detailed, the ALJ is only required to include, in his hypothetical, those impairments that he finds to be supported by the Record. See, Lacroix v. Barnhart, supra at 889. For reasons we have previously expressed, the ALJ properly discounted certain aspects of the opinions of Drs. Karayusuf and Zunkel, and supported his formulation of the Plaintiff's RFC with reasons, and references to the Record, and therefore, the Plaintiff's argument to the contrary is without merit.

Moreover, we note that, based upon his consideration of the Plaintiff's limitations, the ALJ crafted his hypothetical to reflect the Plaintiff's limitations, and assumed, based upon the Record, that the hypothetical individual would only perform unskilled work, with brief and superficial contact with the public, co-workers, and supervisors, and with no rapid or frequent change in work routine. [T. 451-52]. The ALJ also included the Plaintiff's alleged impairment by a cognitive disorder, a psychotic disorder, and an alcohol dependence. [T. 454].

In response, the VE testified that she considered the limitations, which were set forth in the hypothetical, and concluded that jobs were available, in the regional economy, that satisfied those assumed restrictions. [T. 451]. The ALJ then asked the

VE if the individual could remain employed if he was absent for three (3) or more days per month, and the VE responded that he could not. [T. 453-54]. Given that the ALJ included all of the relevant limitations, in his formulation of the Plaintiff's RFC, the VE's testimony constituted substantial evidence to support the ALJ's decision concerning the Plaintiff's ability to work. See, <u>Robson v. Astrue</u>, 526 F.3d 389, 392 (8th Cir. 2008)(recognizing that VE's testimony is substantial evidence when it is based on accurately phrased hypothetical that captures the concrete consequences of the claimant's limitations). Accordingly, we conclude that the assumptions, which were employed by the ALJ in proposing a hypothetical to the VE, properly included those restrictions on the Plaintiff's functional capacities that were consistent with the Record as a whole, and we find no reversible error in this respect.

3. <u>Whether the ALJ failed to follow the Commissioner's Regulations when he denied the Plaintiff's request for a continuance and improperly issued a notice to show cause.</u>

The Plaintiff maintains that the ALJ did not follow the Commissioner's Regulations when he denied the Plaintiff's request for a continuance, and issued a purportedly improper notice to show cause. See, <u>Plaintiff's Memorandum in Support</u>, supra at 14-16. Notably, the Plaintiff has admitted that the ALJ actions, on their face, create no "**apparent** detriment" to the Plaintiff's claims.

Id. at 15 [emphasis in original]. However, the Plaintiff asserts that the ALJ's action raises an inference that the ALJ did not act as a neutral and impartial adjudicator. Id. at 16. As a result, the Plaintiff requests that we closely analyze the ALJ's conclusions, with respect to the weight to be afforded the Plaintiff's medical sources, and the ALJ's RFC finding. Id. Since the Plaintiff's main assertion is that the ALJ's failure to follow the Commissioner's Regulations discloses a bias against the Plaintiff, we turn first to consider whether the ALJ failed to follow those Regulations.

a) <u>The ALJ's Denial of a Continuance</u>.

1) <u>Standard of Review</u>. An ALJ "will change the time or place of the hearing if [a plaintiff] ha[s] good cause[.]" <u>Title 20 C.F.R. §416.1436(d)</u>. Under Title 20 C.F.R. §416.1436(e) good cause is automatically established in two (2) situations which include: "(1) [the plaintiff] or [the plaintiff's] representative are unable to attend or to travel to the scheduled hearing because of a serious physical or mental condition, incapacitating injury, or death in the family; or * * * (2) [s]evere weather conditions make it impossible to travel to the hearing." However, in other circumstances, the ALJ must consider the Plaintiff's "reason for requesting the change, the facts supporting it, and the impact of the proposed change on the efficient administration of the hearing process." <u>Title 20 C.F.R. §416.1436(f)</u>.

Factors affecting the ALJ's decision in making a change include, but are not limited to, "the effect on the processing of other scheduled hearings, delays which might occur in rescheduling [the] hearing, and whether any prior changes were granted * * *." Id. Other circumstances may include that "[y] our representative was appointed within 30 days of the scheduled hearing and needs additional time to prepare for the hearing[.]" Title 20 C.F.R. §416.1436(f)(2).

       2)    Legal Analysis. By way of brief background, on August 17, 2007, the Plaintiff's counsel requested a continuance so as to receive additional input from Dr. Zunkel, and to adequately prepare for the Hearing, since he had only recently been hired by the Plaintiff. [T. 18]. The ALJ rejected the Plaintiff's request, and noted that the Plaintiff's counsel was well-experienced in handling DIB matters, and that he had more than two (2) weeks to prepare for the Hearing on August 30, 2007. Id. In addition, the ALJ determined that "the loss of allotted hearing time and delay that would result from granting the requested continuance did not outweigh the interests of promoting efficient administration of the claimant's hearing and other scheduled hearings." Id. Lastly, the ALJ concluded that any additional information, which would be obtained from Dr. Zunkel, could be submitted after the Hearing, and entered into evidence forthwith. Id.

Here, the Plaintiff contends that the ALJ was required to grant his continuance pursuant to Title 20 C.F.R. §416.1436(f)(2), since he obtained legal counsel less than thirty (30) days prior to the scheduled Hearing. We disagree. As a threshold matter, the ALJ must only rescheduled a Hearing if the plaintiff, or his representative, is unable to travel because of a mental illness, injury, or a death in the family, or because of severe weather. See, Title 20 C.F.R. §416.1436(e). In all other circumstances, including the recent retention of legal counsel, the ALJ is required to weigh the factors, including the effect on other Hearings, and delays in rescheduling the later Hearing. See, Title 20 C.F.R. §416.1436(f).

Here, the ALJ concluded that the delays, and the potential difficulties in rescheduling a subsequent Hearing, weighed against the grant of a continuance. [T. 18]. Moreover, the ALJ concluded that the Plaintiff's counsel was well-equipped to handle the matter, and any additional input from Dr. Zunkel could be entered into evidence after the Hearing. Id. Notably, the Plaintiff did offer such evidence into the Record, and the ALJ considered its import in reaching his decision. [T. 29, 431]. Accordingly, since the ALJ adhered to the Commissioner's Regulations, when he denied the Plaintiff's request for a continuance, we find no reversible error in this respect.

b)     <u>The ALJ's Notice to Show Cause</u>.

1)     <u>Standard of Review</u>.  An ALJ may dismiss a plaintiff's request for a Hearing, if the plaintiff withdraws his request, or if the plaintiff, or his representative, fails to appear at the Hearing, and fails to demonstrate good cause.  See, <u>Title 20 C.F.R. §4 04.957(a)-(b)(1)(I)</u>.  However, if the plaintiff's representative appears at the Hearing without the plaintiff, an ALJ may conclude that the plaintiff has constructively waived his right to appear.  If a plaintiff has failed to appear at the Hearing:

> 1.     * * * The ALJ should advise the [plaintiff's] representative that a Notice to Show Cause will be issued asking the [plaintiff] why he or she did not appear, and why a supplemental hearing should be held. If the [plaintiff] fails to respond to the Notice to Show Cause or fails to provide good cause for failure to appear at the scheduled hearing, the ALJ may then determine that the [plaintiff] has constructively waived his or her right to appear for a hearing, and the ALJ may issue a decision on the record.
>
> 2.   If the [plaintiff] provides good cause for failure to appear, the ALJ will offer the [plaintiff] a supplemental hearing to provide testimony.

<u>Hearings, Appeals and Litgation Law Manual ("HALLEX")</u>, I-2-4-25(D)(1-2), 1993 WL 643012 (2006).

Plainly, the Notice to Show Cause is the mechanism by which the ALJ can determine, through an inquiry to the Plaintiff, whether good cause exists for the failure of the Plaintiff to appear.

2)    <u>Legal Analysis</u>.  As noted, on August 30, 2007,

the Plaintiff failed to appear for his scheduled Hearing, in Minneapolis, Minnesota.

[T. 16].  The Plaintiff's counsel was present, but he informed the ALJ that he had only

recently learned that the Plaintiff would not appear.  <u>Id.</u>  In addition, the Plaintiff's

counsel stated that it was unclear to him why the Plaintiff could not be present.  <u>Id.</u>

The ALJ decided to proceed with the Hearing, and notified the Plaintiff's counsel that

he intended to send the Plaintiff a Notice to Show Cause for his failure to appear at

the Hearing.  [T. 16-17].  Thereafter, on October 15, 2007, the ALJ sent the Plaintiff

a Notice to Show Cause requesting that the Plaintiff provide a reason for his failure

to appear at the Hearing.  [T. 41].  In addition, the ALJ stated that, "[i]f you show

good cause, I will again set a time and place to hear your case," but "[i]f you do not

show good cause, I will dismiss your request for a Hearing."  <u>Id.</u>  The Plaintiff never

provided a statement of good cause and, shortly thereafter, the ALJ issued his

decision.

The  Plaintiff contends that his right to Request a Hearing could only be

dismissed if neither he, nor his counsel, appeared at the Hearing.  See, <u>Plaintiff's</u>

<u>Memorandum in Support</u>, supra at 15.  Although the Plaintiff is correct that the ALJ

could not dismiss his Request for a Hearing, given that his counsel was present at the

Hearing, the Notice to Show Cause was not directed at denying the Plaintiff's Request for a Hearing.

We concede that the ALJ's letter is not a model of clarity, since it failed to inform the Plaintiff that, if he failed to provide good cause, the ALJ would find that the Plaintiff waived his right to appear at the Hearing. However, in his decision, the ALJ specifically referenced that he was construing the Plaintiff's failure to provide good cause as a waiver of his right to appear at the Hearing, pursuant to HALLEX I-2-4-25.[24] [T. 16-17]. Notably, the Plaintiff has not addressed the ALJ's through and detailed reasoning for construing the Plaintiff's failure to provide good cause, as a waiver of his right to appear at the Hearing. Moreover, the Plaintiff has already conceded that such an action, even if it was in error, was harmless to his claim. See, Plaintiff's Memorandum in Support, supra at 15. The simple fact is that the Plaintiff did not respond to the Notice to Show Cause, and therefore, is hard-pressed to contend that he deserved a further Hearing, when he ignored one basis upon which to assert an interest in one. Therefore, we find that the ALJ has not violated the Commissioner's Regulations, and accordingly, find no reversible error.

---

[24]In the ALJ's decision, he cites to HALLEX I-2-4-5, however this must be a clerical error as the quoted passage mirrors HALLEX I-2-4-25. [T. 16-17].

In sum, finding no error in the ALJ's decision, after a thorough and independent review of the Record as a whole, we recommend that Summary Judgment be granted in the Commissioner's favor.

NOW, THEREFORE, It is --

RECOMMENDED:

1.     That the Plaintiff's Motion for Summary Judgment [Docket No.12 ] be denied.

2.     That the Defendant's Motion for Summary Judgment [Docket No. 15] be granted.


Dated:  August 4, 2009                          *s/Raymond L. Erickson*
                                                Raymond L. Erickson
                                                CHIEF U.S.  MAGISTRATE JUDGE


**NOTICE**

Pursuant to Rule 6(a), Federal Rules of Civil Procedure, D. Minn. LR1.1(f), and D. Minn. LR72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties by no later than **August 21, 2009**, a writing which specifically identifies those portions of the Report to which objections are made and the bases of those objections.  Failure to comply with this

procedure shall operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.

If the consideration of the objections requires a review of a transcript of a Hearing, then the party making the objections shall timely order and file a complete transcript of that Hearing by no later than **August 21, 2009**, unless all interested parties stipulate that the District Court is not required by Title 28 U.S.C. §636 to review the transcript in order to resolve all of the objections made.